Cecil SEARS, Plaintiff,

v.

Patricia R. HARRIS, Secretary of Health and Human Services, Defendant.

Civ. A. No. 77-5084-BK.

United States District Court,
S. D. West Virginia,
Beckley Division.

May 28, 1980.

Charles R. Garten, Jr., Charleston, W. Va., for plaintiff.

Robert B. King, U. S. Atty., Charleston, W. Va., for defendant.

## MEMORANDUM ORDER

DENNIS R. KNAPP, Chief Judge.

This is an action under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., for review of the Secretary's partial denial of plaintiff's claim for Disability Insurance Benefits (hereinafter D.I.B.). It is presently before the court on plaintiff's motion for default judgment.

A hearing was held in this matter and the Secretary, by counsel, vigorously contested the court's jurisdiction to grant default judgment against the Secretary in an action under 42 U.S.C. § 405(g). The defendant takes the position that the provisions of 42 U.S.C. § 405(g) and Rule 55(e), Federal Rules of Civil Procedure, preclude the court the power to grant the default. This same argument was addressed by this court in the case of *Bostic v. Harris*, 484 F.Supp. 686, (D.C.1979). While *Bostic* involved a claim for black lung benefits, section 405(g) provides the jurisdictional basis

for both types of actions. *Bostic* held that district courts are empowered to grant default judgment against the Secretary in section 405(g) cases under a two–step process. Step one requires a determination by the court of whether or not good reason exists for the Secretary's failure to file a timely answer. If such reason exists, then the defendant is allowed to file an answer out of time. However, if no good reason is found to exist, the second step is invoked, i. e., a determination of whether or not the Secretary's decision being reviewed is supported by substantial evidence. Since there appears to be no practical distinctions between the two types of claims with regard to their potential for a plaintiff's obtaining a default judgment, the court hereby adopts the rationale and procedure set forth in *Bostic*, supra.

Quite obviously step one of the process requires a relative in–depth discussion of the facts underlying the defendant's failure to file an answer in a timely manner.

■ The plaintiff filed his application for D.I.B. on March 2, 1973. His claim was denied initially and upon reconsideration. An administrative hearing was held and in a decision dated August 10, 1976, the administrative law judge denied benefits. The Appeals Council affirmed this decision, which stood until the Secretary's issuance of a partially favorable decision in November, 1978. The plaintiff initiated this present action on September 15, 1977.

The record reveals that some 26 months elapsed between the plaintiff's initiation of suit and the defendant's tendering an answer to the court. Not all the time is assessable to any negligence on the Secretary's part. As noted supra, the plaintiff filed his complaint on September 15, 1977. Pursuant to Local Rule 2.18, the Secretary is allowed 120 days to file an answer or other responsive pleading. On December 14, 1977, the defendant filed a Motion for Remand. Said motion was granted by an order dated December 20, 1977. On November 29, 1978, some 11 months later, the defendant issued a partially favorable decision. It is important to remember that the defendant's Motion for Remand stated as a ground therefor that a partially favorable decision would be granted by the Secretary upon remand. This court is well aware of the extremely large number of cases before the Secretary, but 11 months seems an excessive amount of time to accomplish the partial granting of benefits where said action was already contemplated. As this court noted in *Bostic*, claimants have the right to a reasonable expectation that their claims will be handled with at least a minimal amount of efficiency and speed.

Upon the issuance of the partial grant of benefits, the defendant admits that said partial grant was "inadvertently" considered a fully favorable decision and consequently no transcript of the record was produced, nor answer made to the plaintiff's complaint. The plaintiff filed a Motion for Default on October 4, 1979, some 11 months after the partial grant was issued. Clearly, the defendant was negligent in handling the plaintiff's claim. It is uncontroverted that the plaintiff was not working throughout the period in question. It would also seem reasonable to assume that the plaintiff considers himself to be entitled to benefits and consequently is anxious for a result to be reached with regard to his claim.

No explanation or rationale presented by the defendant in this action can conceivably be considered a valid reason for the defendant's failure to answer. The court has no way of knowing what, if any, problems for the plaintiff might have been alleviated had the defendant treated his claim in a proper manner, but the defendant's inexcusable negligence can only have served to make the plaintiff and his family's life more rigorous.

The court then has determined from a review of all the facts that the defendant has not shown good reason for the failure to file a timely answer. Accordingly, the second step of the process must be invoked, i. e., whether the defendant's decision as to onset date and eligibility for more than a closed period of disability is supported by substantial evidence.

The plaintiff was 38 years of age at the time he applied for D.I.B. He has a fourth–grade education and cannot read or write. His only supplemental vocational training was a welding course which he did not complete, apparently due to ill health. He began working in the coal mines at age 19, which work remained his primary type of employment over the years. The plaintiff's Social Security earnings record reveals that upon his return to the coal mines after the denial of his first Social Security claim he earned at most some $7,600 (1970), and that his income declined substantially in 1971 and 1972. In the first quarter of 1973, he earned only $455. This constituted his last gainful employment.

The plaintiff's medical records reveal that he has been suffering from a variety of ills since 1966. In March of 1966, he underwent a subtotal gastrectomy, wherein some 50% of his stomach was removed. He was re–hospitalized in June of 1967 for severe gastrointestinal symptoms which required additional complicated gastric surgery.

Dr. Richard G. Starr examined the plaintiff on December 9, 1968. Dr. Starr reported at that time that the plaintiff was suffering from dumping syndrome as a consequence of his gastrectomy, a moderately severe chronic anxiety reaction, chronic bronchitis and mild pulmonary emphysema. Clinic records from the Southern West Virginia Clinic covering a period from February, 1968 to February 27, 1973 show that in addition to the ailments diagnosed by Dr. Starr, the plaintiff suffered from recurring severe pain in his right knee due to an occupational injury.

Dr. M. C. MacAuley, a psychiatrist, treated the plaintiff in 1973. Dr. MacAuley reported on February 19, 1974:

"On the basis of my contact with Mr. Sears, it is my impression that he is undergoing a chronic anxiety reaction with associated depression and there is every evidence that he is functioning as a severely neurotic individual with quite limited ability to function. I do not think that he could be considered able to return to any type of gainful employment at this time and it is my feeling that he should be granted financial assistance until such time as he shows more significant improvement in his condition."

In a report dated September 15, 1974, Dr. James A. Gardner of the Southern West Virginia Clinic reported:

"I do not think this man is fit for heavy labor. I think he is physically fit for light work. I think he is intellectually and educationally unequipped for any work other than that which he did in the mines. Overshadowing all of this, however, is his chronic anxiety and depression which probably renders him unfit at the present time for any employment at all."

Dr. Gardner's finding considered only plaintiff's gastrointestinal and psychiatric impairments and was based on his regular treating of the plaintiff from May, 1972 through the date of the report.

Dr. C. W. Nelson, a certified radiologist, performed a chest X–ray on the plaintiff on January 15, 1974. His diagnosis was pneumoconiosis, category 2p., and moderate emphysema. Dr. William Clopton did a comparison chest X–ray on April 29, 1974, and also found pneumoconiosis. On November 27, 1974, Dr. Donald Rasmussen performed pulmonary function, blood gas and ergometric studies. The studies indicated, in Dr. Rasmussen's opinion, a minimal to moderate loss of respiratory functional capacity.

The plaintiff began receiving psychiatric therapy from Dr. Michael D. McNeer in November, 1977. On March 10, 1978, in a report signed by Dr. McNeer and Michaelene Quesenberry, R.N., it was stated:

"It is my opinion that Mr. Sears is currently psychiatrically disabled to return to his previous vocation and he has probably been so since 1973. I further think that he would be unable to function adequately (emotionally) should he enter *any* vocational setting at this time. I base my opinion on the chronicity of his illness as well as his current stress–coping mechanisms. I plan to continue treating Mr. Sears with the aforementioned regimen over the next six months and will, at that time reevaluate his condition." (Emphasis supplied)

Dr. Joanna Roberts began seeing the plaintiff on August 22, 1974. In a report dated March 28, 1977, Dr. Roberts stated that the plaintiff was being treated for the following conditions:

1. S/P subtotal gastrectomy (1966) with dumping syndrome and post–gastrectomy malabsoption [sic].

2. Malnutrition (height 5′ 10″, weight 137 pounds) Due to above.

3. Chronic obstructive pulmonary disease due to coal miner's pneumoconiosis and chronic bronchitis.

4. Severe psychoneurosis.

Dr. Roberts concluded that, in her opinion, the plaintiff was physically and mentally unable to perform gainful employment.

In a report dated August 22, 1977, Dr. Roberts found that the plaintiff was still unable to perform gainful employment and she stated that his total combined impairment was 92%. The same findings and prognosis are found in a report from Dr. Roberts dated March 9, 1978.

It is obvious from a review of the medical evidence that the plaintiff was universally considered disabled by all his treating physicians. While the opinion of a physician as to disability is not binding upon the Secretary, 20 C.F.R. § 404.1524, it is clear that the Secretary must have some basis upon which to disregard such evidence. This is particularly true in light of the great weight the courts afford the opinions of treating physicians. *Martin v. Secretary*, 492 F.2d 905 (4th Cir. 1974); *Hubbard v. Califano*, 582 F.2d 319 (4th Cir. 1978).

An additional point which weighs very strongly in the plaintiff's favor on the question of disability is that the defendant found the plaintiff eligible for Supplemental Security Income benefits as of September, 1974 and he continues to receive said benefits. While there are numerous differences between the D.I.B. and S.S.I. programs, both programs use the same definition of "disability" as it pertains to sighted adults. Basically, a sighted adult is considered disabled if he or she is:

"[u]nable to engage in any substantial gainful employment by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A).

It would appear that there is a discernable flaw in the Secretary's reasoning here. While admitting that for D.I.B. purposes, the plaintiff was disabled from January 15, 1974 through April of 1976, it was also found, using the same definition of disability, that the plaintiff has been disabled since September of 1974. A classic case of the left hand not knowing what the right hand is doing? It would seem so.

The testimony of the plaintiff during the administrative hearing reads as a litany of the potential miseries a claimant may have to physically and emotionally withstand. Disabled, unskilled and educationally unprepared to learn a skill, the plaintiff turned to his government by applying for Insurance benefits. Ensnared in a web of government ineptitude and confusion, the plaintiff was made to suffer at least some deprivation unnecessarily.

After careful consideration the court has determined that 1) there is no good reason for the defendant's failure to file a timely answer, and 2) the weight of the evidence of record overwhelmingly supports the plaintiff's claim of disability at the time of his application.

Consequently, it is hereby ORDERED that default judgment be, and the same is, entered against the Secretary. It is further ORDERED that the plaintiff be granted Disability Insurance Benefits in accordance with his application of March 2, 1973, and the provisions of the Act, as amended.

It is further ORDERED that this action be dismissed and stricken from the docket.